Filed 2/24/21  Fernandez v. Escutia CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GONZALO FERNANDEZ et al., | H046529, H047015 |
| Plaintiffs and Appellants, | (Santa Cruz County Super. Ct. No. 16CV01358) |
| v. | |
| LUCINO ESCUTIA, | |
| Defendant and Respondent. | |

Appellants Gonzalo and Gloria Fernandez hired respondent Lucino Escutia, a licensed general contractor, to construct a home for them overlooking their commercial strawberry farm.[1]  The Fernandezes fired Escutia before construction on their house was completed and filed a complaint against him alleging multiple causes of action, including causes of action for breach of contract, breach of oral contract, negligent construction, and failure to maintain complete workers' compensation insurance coverage.  Following a court trial, judgment was entered in Escutia's favor, and Escutia was awarded attorney fees.  The Fernandezes appealed both the judgment and the postjudgment order awarding attorney fees.[2]

---

[1] We collectively refer to Gonzalo and Gloria as the Fernandezes and refer to them individually by their first names.

[2] The Fernandezes appealed the trial court's judgment against them following the court trial in case No. H046529.  The Fernandezes filed a separate appeal from the order granting attorney fees and costs in case No. H047015.  On our own motion, we ordered the cases considered together for oral argument and disposition.

On appeal, the Fernandezes argue that the trial court erroneously concluded that Escutia obtained and maintained workers' compensation insurance coverage as required by law during the relevant construction period, the trial court failed to adequately respond to their request for a statement of decision, and the trial court should not have awarded Escutia attorney fees for the workers' compensation claim. We agree with the Fernandezes' arguments pertaining to the award of attorney fees. We affirm the judgment entered in Escutia's favor, but we reverse and remand the postjudgment order awarding attorney fees to the trial court with directions.

## BACKGROUND

1. *The Construction of the Maher Road House*

Escutia, a licensed general contractor, was hired by the Fernandezes to build a new home on the Fernandezes' property overlooking their strawberry farm on Maher Road in Salinas (hereafter "Maher Road house"). Escutia was friends with the Fernandezes, but their relationship later soured, and the Fernandezes fired Escutia before he could complete construction on the house.

2. *The Second Amended Complaint*

On May 22, 2018, the Fernandezes filed a second amended complaint against Escutia alleging multiple causes of action, including causes of action for breach of contract, breach of oral contract, negligent construction, and failure to maintain complete workers' compensation insurance coverage.[3] In part, the Fernandezes argued that Escutia intentionally underreported his payroll and misclassified his employees for workers' compensation insurance purposes, which resulted in an automatic, retroactive suspension of his contractor's license and required disgorgement of all sums paid to him by the Fernandezes for the construction of the Maher Road house.

---

[3] We focus our recitation of the facts on the evidence relevant to the issues raised by the Fernandezes on appeal.

2

3. *Escutia's Answer and Cross-Complaint*

Escutia answered the second amended complaint and raised 12 affirmative defenses. In his sixth affirmative defense, Escutia alleged that any injuries or damages incurred by the Fernandezes were offset by amounts that the Fernandezes owed him. Escutia alleged that in 2011 and 2012, Escutia and the Fernandezes entered into an oral agreement for Escutia to perform construction work at a ranch owned by the Fernandezes on Encinal Road (hereafter "Encinal ranch"), and the Fernandezes failed to pay him for his work and owed him at least $82,000. Escutia further alleged that he entered into an oral agreement with the Fernandezes to build the Maher Road house, but the Fernandezes also failed to pay him for that job and owed him at least $371,988.

Additionally, Escutia filed a cross-complaint against the Fernandezes alleging a cause of action for breach of oral contract in connection with the construction of the Maher Road house, which was dismissed before trial.

4. *Evidence Adduced at the Court Trial*

a. **The Construction of the Maher Road House**

Gonzalo could not read or speak English, but he could read a little Spanish. He lived with his wife Gloria and daughter Lucia. He used to be friends with Escutia and Escutia's wife, Rosa. Gonzalo started discussions with Escutia about building the Maher Road house sometime in 2006 and construction began in 2009. Gonzalo recalled that Escutia told him that the house would be the way his wife Gloria wanted it, "very big and very pretty."

Escutia's wife, Rosa, obtained permits for the construction on Maher Road. Rosa checked boxes on the form that indicated that she was the "owner-builder." At the top of the permit form, the Maher Road house was valued at $758,766.

Escutia prepared a written estimate dated May 6, 2008, to build the Maher Road house for a price of $1,387,673. Escutia also prepared a cost breakdown that itemized the

3

price for each component of the construction project, which totaled $1,387,673. Gonzalo denied that he ever saw this May 6, 2008 estimate or the cost breakdown.

On October 17, 2010, Escutia drafted a "Home Improvement Contract" for the house on Maher Road. The contract listed the price of the house as $517,000. Gonzalo could not read the words in the contract, but he remembered that Escutia told him that the $517,000 price was for a house that would be completely "done."

Gonzalo testified that after construction on the house began, Gloria started to think that the house was too small. New plans were created to build a bigger house. On November 10, 2011, Escutia created a second "Home Improvement Contract" to build a larger house for a price of $985,950. Gonzalo claimed that Escutia told him that "everything" was included in that price.

The 2008, 2010, and 2011 contracts and estimates were unsigned. Escutia testified that the arrangement to build the house was informal, and Gonzalo frequently altered the house plans and would call Escutia to request changes. Escutia claimed that when Gonzalo asked him to construct the house, he simply told Escutia that he wanted a big house and wanted it to be nice. Gonzalo told Escutia that he liked Caesar's Palace in Las Vegas, so Escutia went to visit the hotel and obtained similar finishings at Gonzalo's request. According to Escutia, Gonzalo asked him to prepare the unsigned contracts because Gonzalo wanted to obtain a loan and needed an estimate of the construction costs.

b. **Payments for the Maher Road House and Escutia's Other Work on the Fernandezes' Properties**

Before Gonzalo asked Escutia to construct the Maher Road house, Escutia completed other work on behalf of the Fernandezes. Escutia testified that Gonzalo contacted him in 2005 about clearing a "red tag" violation—issued by the county when construction is in violation of ordinances or local codes—for one of his different properties on Maher Road. The violation was issued after Gonzalo completed some

4

grading work on top of a ridge and removed several protected trees. This violation was eventually resolved. Escutia also testified that in 2010 or 2011, Gonzalo asked him for his help in clearing a "red tag" violation issued for the Fernandezes' Encinal ranch property. Gonzalo had built a bridge and stables that dispensed manure into a nearby river. Escutia testified that he contacted the county and assisted Gonzalo in clearing the violation.

According to Escutia, Gonzalo received another "red tag" violation in 2013 for excavating next to the Maher Road house and inadvertently bulldozing his neighbor's property. Escutia worked to resolve the violation on Gonzalo's behalf and negotiated to build a retaining wall. Ultimately, no retaining wall was built, but Gonzalo testified that he believed he paid Escutia for the construction. Gonzalo testified that Silver Bravo, a subcontractor that Escutia had hired, was the one who performed the illegal excavation.

Escutia claimed that he worked on several different properties on behalf of the Fernandezes between 2010 and 2014, including apartment complexes, a shop, and trailers for some of the Fernandezes' seasonal farm workers. Escutia said that he would periodically ask Gonzalo for money for the various projects that he was working on, and Gonzalo would pay him in a lump sum without specifying which funds were for which project. Sometimes, Gonzalo would pay Escutia in cash with a garbage bag full of money. Gonzalo often altered the plans for the Maher Road house, and Escutia told him that changing designs or plans would be costly because he would have to demolish what was already built and would have to bring in new materials. It was Escutia's understanding that Gonzalo would pay for any price increases brought about by the requested construction changes.

Gonzalo testified that Escutia never complained that Gonzalo owed him money during the construction process. Gonzalo estimated that he paid Escutia a total of $1.8 million for the work he did on the Maher Road house alone. Lucia, Gonzalo's daughter, became concerned about how much the construction was costing and made her

5

own spreadsheet calculating how much her parents had paid to Escutia. Lucia estimated that her parents paid Escutia approximately $1.8 million. Lucia also determined that Escutia had failed to account for $208,000 that her parents had paid him.

Escutia, however, provided documents that showed that some of the checks that Gonzalo wrote to Escutia had notations indicating that the money was paid for construction on projects other than the Maher Road house, including work that was completed on the Fernandezes' Encinal ranch.

In 2014, Gonzalo borrowed approximately $265,000 from Lewis and Associates. On April 20, 2014, Escutia sent Gonzalo an invoice for $265,400, which Escutia believed was then forwarded to Lewis and Associates. Gonzalo understood that Escutia needed the funds to finish construction on the house. Between April 2014 and June 2014, Lewis and Associates sent Escutia checks to pay for the construction. On June 18, 2014, Escutia sent Gonzalo an invoice that indicated that there was a remaining balance of $43,019.52.

c. **Subcontractor Work and Labor Performed on the Maher Road House**

Escutia testified about some of the subcontractors that he hired to complete work on the Maher Road house. Escutia initially retained Silver Bravo to work on grading. Escutia terminated Bravo and hired another company, E&S Trucking, to work on excavating. Bravo submitted proposals to Escutia dated January 11, 2010, and August 17, 2010, and the proposals called for Bravo to cut a road, install rock for a new driveway, excavate and "re compact 3,600-4,000 C.Y. [f]or house [p]ad," among other items.

According to Escutia, the plumbing work was completed by Gonzalo's son-in-law who was a licensed contractor. Central Coast Fire and Sprinklers, another licensed contractor, installed the sprinkler system, and Tunstall Engineering designed a system to bring water from a well down to the house's storage area. The glass and glazing were installed by Central Coast Windows, and the garage door was installed by Central Coast

6

Garage Doors. Victor Suarez completed the stucco work, and Escutia was under the impression that Suarez was a licensed contractor because of paperwork that Suarez had submitted that showed he had a license number. Several other individuals, including Oscar Jimenez, Cesar Jimenez, Joel Zavala, and Ignacio Martinez, completed work on the Maher Road house. Escutia was not aware if any of those individuals were licensed contractors. During trial, Rosa, Escutia's wife, testified that she hand-painted some of the medallion finishings that were installed at the Maher Road house.

Escutia claimed that he provided the Fernandezes' attorneys with all the documents that he received from the subcontractors that he hired. The provided documents, however, were incomplete and there were some subcontracts that appeared to be missing. And in other instances, it was unclear whether the subcontractors performed the labor that Escutia attributed to them. Escutia provided an invoice for Central Coast Windows, which listed the price for the installed windows. However, Escutia did not provide any documents showing how much Central Coast Windows charged for the window installation. And in fact, during his earlier deposition, Escutia said that Central Coast Window solely supplied the windows and Escutia completed the installation work. Escutia said in his deposition that several other suppliers, "Pro Build, Big Creek, San Lorenzo, San Benito Supply," were just suppliers and did not provide labor.

Suarez, one of the subcontractors employed by Escutia, testified at trial. According to Suarez, he was tasked with completing the "paper and wiring," "the stucco," and "the lath" for the Maher Road house. Suarez believed he was supposed to be paid around $38,000 or $39,000 for his work. Suarez said that he did not have a contractor's license, and he had never been licensed. Suarez said that Escutia never asked him if he had a license. Suarez had six other workers assist him. Suarez paid his own employees, and he did not have any workers' compensation insurance.

Before working on the Fernandezes' Maher Road house, Suarez also worked with Escutia on the Encinal ranch, completing stucco work and installing sheetrock.

7

Suarez hired one worker to assist him on that job, but he did not obtain workers' compensation insurance. In total, Suarez claimed that Escutia owed him approximately $12,000 for work that he completed on both the Encinal ranch and the Maher Road house.

At trial, Suarez was asked about some paperwork that Escutia had received that displayed Suarez's name and a license number. Suarez said he did not know how that document was created, and he could not recall if he ever gave it to Escutia. Suarez also testified that he could not read English.

### d. **Escutia's Termination**

Escutia never completed construction of the Maher Road house. In June 2014, Escutia and Gonzalo got into an argument. Gonzalo testified that Escutia argued with him and left the jobsite. Escutia testified that Gonzalo was facing legal troubles in 2014 and became angry over change orders that increased the construction cost. According to Escutia, the men got into an argument, and Gonzalo threatened Escutia and told him to leave.

### e. **Completion of Construction on the Maher Road House**

After Escutia stopped working on the Maher Road house, Gonzalo estimated that he spent an additional $67,000 to complete the construction. Lucia testified that two contractors were hired. One contractor was hired to complete the concrete work, which cost approximately $41,000. The second contractor worked inside the house and cost approximately $16,000. The second contractor completed his work sometime in December 2014.

Lucia obtained a certificate of occupancy for the Maher Road house in March 2017. It took time for her to obtain the certificate because she needed to complete certain tasks, including a grading inspection, and the family also had to address a "red flag" violation that was placed on the property after a storm caused erosion.

8

f. **Escutia's Contractor's License**

Robert Berrigan previously worked as a licensing deputy at the California State Contractors Board and testified on Escutia's behalf as an expert in contractor licensing requirements. He was familiar with bond and workers' compensation requirements and was also familiar with the grounds for discipline for a licensed contractor that violates his or her licensing obligations.

Berrigan reviewed the license history for Escutia's business, Lucino's General Construction. Escutia had a valid contractor's license from the California State License Board (CLSB). The license history showed that between June 1, 2010 and the middle of 2014, Escutia had a valid contractor's license with the exception of a two-week period between December 9 and December 27, 2013, when his license was suspended. Berrigan opined that assuming that Escutia did not perform any work on the Maher Road house during that two-week period in December 2013, he had a valid contractor's license when he worked on the house.

At trial, Escutia testified that he did not do any work on the Maher Road house during the two-week period when his contractor's license was suspended in December 2013. According to Escutia, his license was suspended after he made a late payment to his workers' compensation insurance company, and he quickly worked to reinstate his coverage once he had notice that it had lapsed.

g. **Escutia's Workers' Compensation Insurance Coverage**

Escutia had workers' compensation insurance coverage from the State Compensation Insurance Fund (SCIF) during the period that he worked on the Maher Road house. In 2007, Escutia pleaded no contest to working without workers' compensation insurance in an unrelated case.

Myles Corcoran, a construction consultant, testified on behalf of the Fernandezes. Corcoran was a general contractor who was also a certified building inspector. Corcoran testified about some of the alleged construction defects that he saw when he visited the

9

Maher Road house. He also reviewed the records that Escutia sent to SCIF and Escutia's business records.

After reviewing Escutia's receipts, Corcoran accounted for a total of almost $736,000 for labor and materials for the Maher Road house, with labor accounting for approximately $129,000 of the cost and materials accounting for approximately $610,000.

Corcoran was aware that Gonzalo asserted that his family paid over $1.8 million for the project. Corcoran was also aware that Escutia had previously said in a deposition that he had been paid $1.6 million for the project and was still owed $265,400 at the end of 2014. Based on these figures and the receipts for the materials that he analyzed, Corcoran estimated that the actual labor cost for the Maher Road home totaled approximately $1,260,000. In contrast, Escutia's payroll reports and the amounts reported to the Workers' Compensation Board totaled approximately $129,000. Additionally, some of the records indicated that Escutia allocated labor costs to projects other than the Maher Road house, so not all of the $129,000 in labor receipts could be attributed to that project.

Based on his experience, Corcoran did not believe that a house like the Maher Road house could be constructed with $129,000 worth of labor. He believed that the labor cost for a home like the Maher Road house should be approximately 50 percent of the total construction cost because of the skillful finishes that were required for the build. Thus, Corcoran estimated that if the house cost $1.6 million to $1.8 million to complete, the labor cost should have been around $800,000 to $900,000.

Corcoran sorted Escutia's payroll records into years. Using his construction knowledge and photographs of the construction work that he reviewed, he created a table that showed certain workers' compensation categories that should have been included in the documents that Escutia sent to the SCIF. Corcoran explained that there were different

10

premiums for different work categories, and premiums also varied depending on the skill of the laborer.

The earliest photograph that he reviewed to create the table had a date stamp of November 16, 2009, and showed the "original rough cut of the driveway" leading to the house. In another photograph dated October 14, 2010, workers can be seen excavating and beginning work on the slab foundation for the house. The photograph also showed that progress had been made on the plumbing. Finally, in a photograph dated October 27, 2010, eight people were seen working on a concrete pour.

The Maher Road house was coated with stucco, but Corcoran testified that Escutia did not identify any stucco work in his SCIF submittals. Escutia also did not classify any of his workers as plumbers, roofers, concrete workers, or waterproofers even though there were photographs of construction work that showed that this category of work was completed on the Maher Road house. In fact, Escutia did not report any payroll in 2010, despite the existence of photographs that showed that construction on the house had already begun.

Corcoran also reviewed a video from June 2014 of construction being completed on the Maher Road house. The video depicted approximately 10 people working on the house. However, between 2010 and 2014, Escutia listed at most five employees for purposes of workers' compensation insurance, payroll, and tax purposes. Rosa, Escutia's wife, was listed as a secretary. She was never listed as a painter for workers' compensation purposes.

Corcoran acknowledged that Escutia would not have needed to report payroll for any licensed subcontractors. He acknowledged that it appeared that some work was completed by subcontractors, but Escutia had also said during his deposition that he and his brothers completed a large amount of work on the house, including "some grading, all the concrete, all the masonry, framing, roofing, all the waterproofing, all the flashing, fenestration, electrical, the finish plumbing, not the rough, and all the finishes, trim,

11

stairway, floors, tile, hardwood, bathroom finishes and all the painting and all the heating." Corcoran testified that he reviewed all the records and receipts that Escutia provided, but he also acknowledged that he did not review documents that were specific to the Encinal ranch.

5. *The Judgment and the Statement of Decision*

On October 2, 2018, the trial court issued a tentative decision. In its decision, the trial court found the Fernandezes' cause of action for breach of contract, which was based on the 2011 estimate prepared by Escutia, failed because the contract was unsigned, Gonzalo did not see the written contract, the Fernandezes could not read English, and Escutia denied entering into the written contract. The trial court, however, found that the parties entered into an oral agreement to complete the Maher Road house but that there was no breach of oral contract. The trial court further found that Escutia maintained adequate workers' compensation insurance coverage and substantially complied with his obligation under Business and Professions Code section 7031, subdivision (e).[4] Finally, the court determined that Escutia was not entitled to any offset.

After the Fernandezes requested a written statement of decision, the trial court issued a judgment and order in Escutia's favor on November 26, 2018. The order and judgment largely adopted the trial court's previous tentative decision.

The trial court, however, expanded on its decision on the Fernandezes' cause of action alleging that Escutia failed to obtain complete workers' compensation coverage. The trial court cited *Wright v. Issak* (2007) 149 Cal.App.4th 1116 (*Wright*), where a different panel from this court found that a contractor that reported zero and close to zero payroll did not obtain workers' compensation insurance coverage, distinguished the case on its facts, and denied the Fernandezes' claim for disgorgement. The trial court also

---

[4] Unspecified statutory references are to the Business and Professions Code.

found Escutia to be the prevailing party and concluded that he could apply for an award of costs under Code of Civil Procedure section 1032 et seq.

6. *Attorney Fees*

On January 25, 2019, Escutia filed a motion for an award of attorney fees and costs under Civil Code section 1717 seeking $157,659.66. The Fernandezes opposed the motion, arguing that there was no written contract upon which the award of attorney fees could be based. On April 4, 2019, the trial court granted Escutia's motion and ordered $103,717.50 in attorney fees and $28,049.50 in costs for a total of $131,767.

## DISCUSSION

1. *Workers' Compensation Coverage*

On appeal, the Fernandezes argue that the trial court erroneously concluded that Escutia complied with sections 7031 and 7125.2 and obtained and maintained workers' compensation insurance coverage. The Fernandezes argue that Escutia intentionally underreported his payroll, misclassified his workers, and used unlicensed subcontractors, and, as a result, his contractor's license was automatically suspended retroactive to October 2010.

a. **Standard of Review**

We review the trial court's statutory interpretation de novo. (*Wright*, *supra*, 149 Cal.App.4th at p. 1120.) " ' "A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. . . . In construing a statute, our first task is to look at the language of the statute itself. . . . When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. . . ." . . . [¶] In examining the language of the statute, we must consider "the context of the statute . . . and the statutory scheme of which it is a part. 'We are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." . . .' . . . ' "If possible, significance should be given to every

13

word, phrase, sentence and part of an act in pursuance of the legislative purpose.". . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.". . . Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' " ' " (*Ibid*.)

We review the trial court's findings of fact, both express and implied, for substantial evidence. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461-462.) We review the evidence, contradicted or uncontradicted, in the light most favorable to the prevailing party, and resolving all conflicts in the judgment's favor. (*Id*. at p. 461.) The substantial evidence standard applies to findings of fact made by the trial court in a statement of decision rendered after a court trial. (*Id*. at p. 462.) We "presume that the trial court made all factual findings necessary to support the judgment so long as substantial evidence supports those findings . . . unless the omissions and ambiguities in the statement of decision are brought to the attention of the superior court in a timely manner."[5] (*Ibid*.)

b. **Sections 7031 and 7125.2**

" 'To protect the public, the Contractors' State License Law [citation] imposes strict and harsh penalties for a contractor's failure to maintain proper licensure.' " (*Loranger v. Jones* (2010) 184 Cal.App.4th 847, 854 (*Loranger*).) Section 7031, subdivision (b) states in pertinent part: "Except as provided in subdivision (e), a person

---

[5] Citing *In re I.W.* (2009) 180 Cal.App.4th 1517, disapproved of on another ground as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, the Fernandezes also argue that "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*I.W.*, *supra*, at p. 1528.) This standard, however, applies when the trier of fact finds that the party with the burden of proof did not carry its burden, and that party appeals. Under section 7031, subdivision (d), Escutia bore the burden to prove licensure, and the trial court concluded that he carried his burden. Thus, the standard articulated in *I.W.* is inapplicable to the current case.

14

who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract."

At the time of the construction on the Maher Road house, former section 7031, subdivision (e) provided that a trial court could determine that there was substantial compliance with licensure requirements if it is shown at an evidentiary hearing that the person engaged as a contractor "(1) had been duly licensed as a contractor in this state prior to the performance of the act or contract, (2) acted reasonably and in good faith to maintain proper licensure, (3) did not know or reasonably should not have known that he or she was not duly licensed when performance of the act or contract commenced, and (4) acted promptly and in good faith to reinstate his or her license upon learning it was invalid." (Former § 7031, subd. (e), Stats. 2003, ch. 289, § 1.)[6] Section 7031, subdivision (d) provides that "[w]hen licensure or proper licensure is controverted, the burden of proof to establish licensure or proper licensure shall be on the licensee."

Moreover, section 7125.2 provides in pertinent part that "[t]he failure of a licensee to obtain or maintain workers' compensation insurance coverage, if required under this chapter, shall result in the automatic suspension of the license by operation of law in accordance with the provisions of this section." Section 7125.2, subdivision (a) provides that "[t]he license suspension imposed by this section is effective upon the earlier of either of the following: [¶] (1) On the date that the relevant workers' compensation

---

[6] The current version of section 7031, subdivision (e) has three elements that must be shown at evidentiary hearing to demonstrate substantial compliance: "the person who engaged in the business or acted in the capacity of a contractor (1) had been duly licensed as a contractor in this state prior to the performance of the act or contract, (2) acted reasonably and in good faith to maintain proper licensure, and (3) acted promptly and in good faith to remedy the failure to comply with the licensure requirements upon learning of the failure." Section 7031, subdivision (e) was amended to eliminate the condition that the contractor did not know or should not have reasonably known that he or she was unlicensed.

insurance coverage lapses. [¶] (2) On the date that workers' compensation coverage is required to be obtained." Section 7125.2, subdivision (b) provides that a licensee subject to suspension under section 7125.2, subdivision (a)(1), when workers' compensation insurance coverage lapses, "shall be provided a notice by the registrar" that includes relevant information such as the reason for the license suspension and the suspension's effective date.

In sum, there are two reasons why a licensee's license may be suspended under section 7125.2. A licensee that fails to *obtain* workers' compensation insurance has his or her license automatically suspended, retroactive to the date that the insurance was required to be obtained. (§ 7125.2, subd. (a).) A licensee that fails to *maintain* workers' compensation insurance also has his or her license suspended, but the suspension is not automatic. That suspension occurs on the date the insurance coverage lapses and requires a notice from the registrar as described under section 7125.2, subdivision (b).

### c. *Wright v. Issak* and *Loranger v. Jones*

There are two primary appellate cases that analyze a contractor's failure to *obtain* workers' compensation insurance coverage under section 7125.2, *Wright*, *supra*, 149 Cal.App.4th 1116, a case from this court, and *Loranger*, *supra*, 184 Cal.App.4th 847, a case from the Third Appellate District.

In *Wright*, *supra*, 149 Cal.App.4th 1116, a contractor sued the homeowners for breach of contract and related causes of action. The homeowners alleged that the contractor was not licensed and filed a cross-complaint, seeking reimbursement of the amount they paid to the contractor. (*Id.* at pp. 1118-1119.) The evidence showed that the contractor reported a payroll of $312 to SCIF while having an actual payroll of $135,000 between November 2003 and August 2004, and he reported zero or next to zero payroll for every payroll period between his initial application for workers' compensation insurance in May 2002 through the end of 2004. (*Id.* at p. 1119.) The contractor's

16

underreporting "was not inadvertent," and "[i]t was his pattern and practice from the first moment he applied for workers' compensation insurance." (*Ibid*.)

We reviewed section 7125.2 in *Wright* and concluded that under the statute, a contractor's license is automatically suspended as of the date that he or she was required to obtain workers' compensation insurance but did not. (*Wright*, *supra*, 149 Cal.App.4th at p. 1121.) Applying section 7125.2, we held that "because [the contractor in *Wright*] underreported his payroll and, thus, did not obtain workers' compensation insurance in 2004, [his] license was suspended before, during, and after he performed work on [the homeowners'] home." (*Wright*, *supra*, at p. 1121.)

The contractor in *Wright* argued that he had a valid contractor's license because he never received a registrar's notice as described under section 7125.2, subdivision (b). (*Wright*, *supra*, 149 Cal.App.4th at p. 1121.) We rejected this argument, noting that section 7125.2 has two failure prongs—a failure to " 'obtain' " workers' compensation insurance, and a failure to " 'maintain' " workers' compensation coverage. (*Wright*, *supra*, at p. 1122.) Section 7125.2, subdivision (b) provides for a registrar's notice only if the suspension is for a failure to *maintain*. (*Wright*, *supra*, at p. 1122.) However, we concluded that "[a] case about underreporting payroll is, by definition, a failure-to-obtain case rather than a failure-to-maintain case." (*Ibid*.) Thus, this court affirmed the amended judgment finding that the contractor's license had been automatically suspended by operation of section 7125.2 due to his failure to obtain workers' compensation insurance. (*Wright*, *supra*, at pp. 1121-1124.)

Several years after *Wright* was decided, the Third Appellate District decided *Loranger*, *supra*, 184 Cal.App.4th 847. In *Loranger*, the contractor, who was retained by two homeowners to construct a house, hired an unlicensed subcontractor as an electrician, another unlicensed subcontractor to excavate dirt, and hired his 13-year-old son and a teenage friend to add support to the house's subfloor. (*Id*. at pp. 850-851.) The contractor was unaware that the electrician's license had expired, but he testified that

17

neither his son nor his son's friend had work permits. The homeowners relied on *Wright*, *supra*, 149 Cal.App.4th 1116, and argued that they were entitled to disgorgement of the funds they had paid to the contractor. (*Loranger*, *supra*, at pp. 855-856.)

*Loranger* distinguished *Wright*, noting that "the limited facts before the court [in *Wright*] strongly suggest the contractor there did not have and never had a policy of workers' compensation insurance, that he intentionally underreported the wages he was paying (reporting zero or next to zero payroll), and that he did so to be excluded from the requirement of obtaining such insurance." (*Loranger*, *supra*, 184 Cal.App.4th at p. 857.) Furthermore, *Loranger* disagreed with the application of *Wright*'s reasoning to conclude that " 'any' underreporting of payroll is a failure to 'obtain' workers' compensation insurance even though the contractor has in effect a policy of workers' compensation insurance covering his/her employees." (*Loranger*, *supra*, at p. 857.) *Loranger* further noted, "we neither have been cited to nor have we found any authority for the proposition that a worker found to be an employee of a contractor (by virtue of Lab. Code, § 2750.5 or otherwise) will not be covered by the contractor's existing workers' compensation insurance policy if there is any discrepancy in the contractor's reporting of payroll." (*Id.* at pp. 857-858.)

As a result, the *Loranger* court concluded that the contractor's testimony that he had workers' compensation insurance coverage for his employees during the period that he worked on the homeowners' home satisfied his burden of proof to show that his license was not suspended for a failure to obtain workers' compensation insurance coverage under section 7125.2. (*Loranger*, *supra*, 184 Cal.App.4th at p. 858.)

Both *Wright* and *Loranger* contemplated what it means to "obtain" workers' compensation insurance under section 7125.2. The Fernandezes interpret the statute as requiring that a licensed contractor obtain and maintain *complete* workers' compensation insurance coverage. Thus, the Fernandezes insist that a contractor has failed to "obtain"

18

coverage if he or she underreports payroll, miscategorizes employees, or uses unlicensed subcontractors.

We disagree with the Fernandezes' interpretation of section 7125.2, which inserts language not found in the statute. Section 7125.2's wording is unambiguous. The Oxford English Dictionary defines "obtain" as "[t]o come into the possession of; to procure; to get, acquire, or secure." (Oxford English Dict. Online (2017) < **https://perma.cc/H5WP-U5CM** > [as of Feb. 22, 2021].) Thus, the automatic suspension of a contractor's license under section 7125.2 will take effect if a contractor fails to procure workers' compensation insurance—not if a contractor fails to procure *adequate* workers' compensation insurance coverage.

Furthermore, we agree with the *Loranger* court's analysis of *Wright*. Our decision in *Wright* should not be construed as holding that *any* underreporting of payroll results in a failure to obtain workers' compensation insurance under section 7125.2. In *Wright*, the defendant did not obtain workers' compensation insurance in 2004 "because [he] underreported his payroll" (*Wright, supra*, 149 Cal.App.4th at p. 1121) by reporting "zero or next to zero payroll for every payroll period" (*id*. at p. 1119) during the relevant period. As the *Loranger* court concluded, the *Wright* contractor "did so to be excluded from the requirement of obtaining [workers' compensation] insurance." (*Loranger, supra*, 184 Cal.App.4th at p. 857.)

In other words, the *Wright* contractor's severe underreporting of payroll resulted in a failure to obtain insurance, not merely a failure to obtain sufficient insurance coverage. " ' "We may not, under the guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." ' " (*Switzer v. Wood* (2019) 35 Cal.App.5th 116, 129.) "A court may not insert qualifying provisions not included, and may not rewrite a statute to conform to an assumed intention which does not appear from its language." (*White v. City of Stockton* (2016) 244 Cal.App.4th 754, 759-760.)

d. **Public Policy Considerations**

The Fernandezes argue that the trial court's interpretation of section 7125.2 and its judgment encourages underreporting payroll, false reporting, and underinsuring workers. The Fernandezes also claim that affirming the trial court's decision will deprive customers from obtaining the remedy of disgorgement against a licensee that egregiously violates license reporting laws.

We agree with the Fernandezes to the extent that they argue that section 7031's purpose is "to protect the public from incompetence and dishonesty in those who provide building and construction services." (*Hydrotech Systems*, *Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995.) We also agree that it is the public's best interest to ensure that licensed contractors have workers' compensation insurance coverage, a requirement that is codified in section 7125.2. And we acknowledge the Fernandezes' concern that a licensed contractor who is later found to have underreported a portion of payroll will not face the penalty of disgorgement. Berrigan, Escutia's expert, testified that the Contractors State License Board will not suspend a contractor's license for underreporting payroll unless the contractor is convicted of fraud, a process that could take several years and will not result in a retroactive suspension.

The trial court's judgment, however, does not encourage licensed contractors to flagrantly underreport payroll or commit workers' compensation insurance fraud. As illustrated in *Wright*, severe underreporting of payroll that culminates in a failure to obtain workers' compensation insurance results in an automatic suspension of a contractor's license retroactive to the date when workers' compensation insurance should have been obtained, permitting aggrieved consumers to obtain the remedy of disgorgement. (*Wright*, *supra*, 149 Cal.App.4th at p. 1121; § 7031, subd. (b).) As we explain in more detail in the next section of this opinion, however, the trial court reasonably determined that *Wright* was distinguishable on the facts.

20

The Fernandezes argue that the purpose of workers' compensation is thwarted if customers must prove noncoverage, and the statute's legislative purpose is better served by placing the burden on contractors to show that their employees are fully covered. The Fernandezes also insist that the trial court's statement of decision shifted the burden of proof from Escutia to the Fernandezes.

In its statement of decision, the trial court asserted that even if there was some discrepancy with Escutia's payroll or even if he used at least one subcontractor that claimed to be licensed but was not, "there [was] no authority presented to the Court for the proposition that a worker found to be an employee of Mr. Escutia would not have been covered by his existing policy of workers' compensation." We agree with the trial court's statement.

Labor Code section 2750.5 creates a rebuttable presumption that "a worker performing services for which a license is required pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, or who is performing such services for a person who is required to obtain such a license is an employee rather than an independent contractor." Distinguishing between an employee and an independent contractor is important for workers' compensation purposes. "The Workers' Compensation Act . . . extends only to injuries suffered by an 'employee,' which arise out of and in the course of his 'employment.' " (*S.G. Borello & Sons*, *Inc*. *v*. *Department of Industrial Relations* (1989) 48 Cal.3d 341, 349.) However, under Labor Code section 2750.5, a contractor's employees for workers' compensation purposes can include individuals that are not listed on a contractor's payroll. And employees of unlicensed subcontractors that are deemed employees of a licensed contractor by operation of Labor Code section 2750.5 are considered covered by the contractor's workers' compensation insurance. (*Neighbours v*. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 330-333.)

21

This is because workers' compensation coverage should be broadly construed. "[T]he whole theory of the Workmen's Compensation Act is to put a burden in limited amounts upon employers for all industrially caused injuries and deaths regardless of fault, and concomitantly to take from employees . . . the right of recovering any greater amounts even though the injury . . . is tortuously caused by the employer.  It is inherent in this system that the statutory recovery, whatever it may be, shall be allowed in every case to which the statute makes it applicable, and apparent hardship in individual cases to either employer, employee or dependents . . . must be disregarded in view of the social desirability of the system as a whole." (*Pacific Gas & Electric Co. v. Industrial Acci. Com.* (1961) 56 Cal.2d 219, 223.)[7]

Furthermore, we have reviewed the record and find no indication that the trial court improperly shifted the burden of proof from Escutia to the Fernandezes.  The trial court determined that Escutia met his burden to prove that he was licensed during the relevant time periods, and he obtained and maintained workers' compensation insurance. For the purposes of establishing that he *obtained* workers' compensation insurance, Escutia was not required to individually substantiate the wages that were reported for all employees, including those considered employees by virtue of Labor Code section 2750.5.  (See *Loranger*, *supra*, 184 Cal.App.4th at p. 858 [contractor did not have to prove the amount of wages paid to each employee and match those wages to

[7] The broad construction afforded to workers' compensation insurance coverage supports our view that some discrepancies in a contractor's filings with a workers' compensation insurance carrier does not result in a total failure to obtain insurance. There is a difference between a contractor who has a policy of workers' compensation insurance in place and a contractor who does not have *any* workers' compensation insurance coverage at all.  As we have stated, a contractor that fails to list a worker employed by an unlicensed contractor as an employee for workers' compensation purposes has not necessarily obtained inadequate insurance coverage because those employees are considered covered by the contractor's workers' compensation insurance policy.  (*Neighbours v. Buzz Oates Enterprises*, *supra*, 217 Cal.App.3d at pp. 330-333.)

reports to SCIF to prove workers' compensation insurance coverage was obtained and maintained during duration of construction work].)  Escutia testified that he believed that his payroll and the workers' compensation records that were submitted to SCIF were correct.  Escutia's testimony was sufficient to show that he obtained workers' compensation insurance coverage during the relevant construction period.

Finally, our interpretation of section 7125.2 in *Wright* and in this case does not limit the civil and criminal penalties that licensed contractors face if they engage in workers' compensation insurance fraud.  Labor Code section 3820 describes acts of fraud and abuses of the workers' compensation system that are subject to civil monetary penalties.  Insurance Code section 1871.4 describes false and fraudulent claims that are deemed unlawful.  And Penal Code section 550 criminalizes false and fraudulent claims or statements and prescribes criminal fines and imprisonment for such conduct.  Moreover, workers' compensation insurers can recover, as victim restitution, premiums that they would have earned in the absence of fraudulent representations made by a contractor about the category of work performed by covered employees.  (*People v. Riddles* (2017) 9 Cal.App.5th 1248, 1253-1254.)  Simply put, licensed contractors that engage in insurance fraud face a whole host of criminal and civil punishments.

In sum, the Fernandezes' claims that policy considerations weigh in favor of reversing the judgment must be rejected.

### e. **Substantial Evidence Supports the Trial Court's Determination That Escutia Was Licensed When He Performed Construction on the Maher Road House**

In this case, the trial court determined that Escutia was properly licensed and obtained and maintained workers' compensation insurance coverage at all times when performing work on the Maher Road house.[8]  The Fernandezes argue that the trial court

---

[8] In their opening brief, the Fernandezes note that the trial court's tentative decision asserted without explanation that Escutia "substantially complied" with (continued)

erroneously concluded that Escutia complied with the pertinent statutes and substantial evidence does not support its decision. They insist that the facts of this case establish that Escutia engaged in the type of egregious underreporting of payroll that took place in *Wright* culminating in a failure to obtain insurance, and the evidence establishes that Escutia misclassified his employees, used unlicensed subcontractors, and allowed his workers' compensation policy to lapse for two weeks in December 2013. We must reject the Fernandezes' arguments.

First, the Fernandezes argue that the evidence establishes that Escutia failed to obtain workers' compensation insurance in October 2010 when he reported zero payroll even though work on the Maher Road house's foundation had already begun. The Fernandezes claim that it is undisputed that Escutia was paid over $250,000 in late 2010 when the foundation was poured, and when the framing, plumbing, and electrical work on the house began. The Fernandezes also insist that the evidence demonstrates that Escutia grossly unreported his payroll between 2011 and 2014 because their expert, Corcoran, testified that he believed that a construction project like the Maher Road house would require a payroll of $800,000 to $900,000 to complete, and Escutia reported only $129,000 worth of labor to SCIF during the relevant time period.

Escutia, however, testified that he hired multiple subcontractors to complete work on the Maher Road house. In particular, he testified that he retained Silver Bravo to work on the grading, and he later hired another company, E&S Trucking, to work on excavating. Bravo submitted proposals to Escutia dated January 11, 2010, and August 17, 2010, and the proposals called for Bravo to cut a road, install rock for a new driveway, excavate and "re compact 3,600-4,000 C.Y. [f]or house [p]ad," among other

sections 7031 and 7125.2, but Escutia did not assert substantial compliance in the proceedings below. Although the trial court referenced "substantial compliance" in its tentative decision, it omitted its reference to substantial compliance in its final statement of decision and found that Escutia complied with sections 7031 and 7125.2.

items.  Any labor provided by Bravo—or any other licensed subcontractor—would not ordinarily appear on Escutia's payroll.[9]  Moreover, in its statement of decision, the trial court expressly credited Escutia's testimony that work on the Maher Road house stopped and started periodically depending on the Fernandezes' ability to pay, which would account for the periods of time when no payroll was reported.

The Fernandezes argue that Escutia's testimony about the construction work that was performed by subcontractors was contradicted by statements that he made during his own deposition.  During his deposition, Escutia claimed that some of the subcontractors, including San Benito Supply and Central Coast Windows, supplied only materials, and Escutia himself performed much of the labor at the house.  Escutia, however, testified at trial that he believed the reports that he made to SCIF were accurate.  Ultimately, the trial court, who was the finder of fact below, found Escutia's trial testimony about the subcontractor work to be credible despite the existence of contrary evidence.[10]  It is not our role as the appellate court to second-guess the trial court's credibility determinations or substitute our judgment for that of the trial court.  (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 349 ["we do not second-guess the calls the trial court made regarding

---

[9] We acknowledge that during trial, Escutia was presented with a photograph that showed ongoing construction work at the Maher Road house, with a person installing hardwood floor over the concrete slab sometime in September or October 2010.  Escutia, however, testified that he was unsure about who the person was, and he was not sure if the person who was in the photograph was ever listed as his employee for payroll purposes.  The trial court could have reasonably credited Escutia's testimony and concluded that the person shown in the photograph was an employee of one of the licensed subcontractors retained by Escutia to work on the Maher Road house.

[10] Escutia would have been entitled to a larger offset if he could have proven that he performed *more* labor on the Encinal ranch or the Maher Road house.  On the other hand, claiming that he did *less* labor on the Maher Road house would have supported his claim that his payroll was not underreported.  It is unclear if his trial testimony was influenced by either of these motivations.  Regardless, as the reviewing court, we do not reweigh the evidence.

credibility"].) And the testimony of one witness, even if that witness is a party to an action like Escutia himself, can constitute substantial evidence in support of the judgment. (*In re Marriage of Ankola* (2020) 53 Cal.App.5th 369, 380.)

The Fernandezes also argue that the trial court erroneously failed to consider that Escutia retained unlicensed, not licensed, subcontractors to perform work on the Maher Road house. Whether Escutia knowingly used unlicensed subcontractors was disputed at trial. Suarez, who completed stucco work on the Maher Road house, did not have a contractor's license. Escutia, however, claimed that he was under the impression that Suarez was a licensed contractor based off paperwork that Suarez had shown him that showed he had a contractor's license number. Thus, substantial evidence supports the trial court's determination that Escutia did not knowingly use unlicensed subcontractors to complete work on the Maher Road house.

Next, the Fernandezes insist that Escutia's license should have been deemed suspended because he intentionally misclassified workers for purposes of workers' compensation insurance coverage. For example, Rosa, Escutia's wife, testified that she painted some of the medallions installed at the Maher Road house, but she was classified as performing clerical work on Escutia's SCIF submittals. Corcoran testified that Escutia did not classify any workers as roofers or other high-risk trades. However, much of the evidence about Escutia's purported misclassification was disputed. Escutia testified that he properly reported his payroll, and the trial court could have reasonably concluded that roofing and other work was completed by licensed subcontractors. Moreover, minor misreporting of an employee's classification for workers' compensation insurance purposes is not comparable to the contractor's failure in *Wright* to obtain insurance.

Finally, it is undisputed that Escutia's contractor's license was suspended for two weeks in December 2013. Escutia acknowledged the suspension and testified that he did not do any work on the Maher Road house during that two-week period. He further testified that he worked quickly to remedy the suspension once he became aware of the

26

situation. Escutia's testimony constituted substantial evidence that he did not erroneously work on the Maher Road house during the period when his license was suspended.

In sum, the Fernandezes' attempt to analogize this case to *Wright* fails. The Fernandezes erroneously focus on the evidence most favorable to their position, ignoring the contrary evidence in the record and treating evidence favorable to their position as undisputed. We agree with the Fernandezes that there was evidence that Escutia underreported his payroll. We also agree with the Fernandezes that there was evidence that the level of underreporting was not as de minimis as the payroll discrepancies presented in *Loranger*. However, in reviewing the sufficiency of the evidence, " '[w]e emphasize that the test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld.' " (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 369.) Whether Escutia underreported his payroll, intentionally used unlicensed subcontractors, and intentionally misclassified employees were disputed factual issues. The trial court resolved these factual disputes in Escutia's favor. The existence of contradictory evidence in the record does not negate the existence of substantial evidence supporting the trial court's findings.

f. **We Do Not Reach The Fernandezes' Arguments Pertaining to Their Request for Disgorgement**

Because we conclude that the trial court did not err when it found that Escutia obtained and maintained workers' compensation insurance during the relevant period, we do not need to reach the arguments raised by the Fernandezes about their request for disgorgement, including their arguments that the judgment improperly requires them to prove their disgorgement damages exactly and the judgment improperly limits disgorgement to labor and materials for the Maher Road house. Disgorgement would be available only if the trial court had concluded that Escutia was unlicensed when he

27

performed work that required a license.  (§ 7031, subd. (d).)  Since the trial court found that Escutia was properly licensed during the relevant time period, the Fernandezes are not entitled to disgorgement.

### 2. *Statement of Decision*

After the trial court issued its tentative decision, the Fernandezes requested a statement of decision, asking the trial court to make specific findings on their workers' compensation cause of action.  The Fernandezes argue that the trial court did not adequately respond to their request for a statement of decision because it did not address all the questions raised by the Fernandezes in their request.

### a. **General Principles**

Code of Civil Procedure section 632 states in pertinent part, "[t]he court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial."

" ' "A trial court rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts.  A trial court is not required to make findings with regard to detailed evidentiary facts or to make findings as to individual items of evidence.  Only where a trial court fails to make findings as to a material issue which would fairly disclose the determination by the trial court would reversible error result.  Even though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings.  A failure to find on an immaterial issue is not error. [Citation.]  In issuing a statement of decision, the trial court need not address each question listed in a party's request.  All that is required is an explanation of the factual and legal basis for the court's decision regarding such

28

principal controverted issues at trial as are listed in the request." ' "  (*Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 163.)

b. **The Trial Court's Statement of Decision Was Adequate**

The Fernandezes argue that the trial court's statement of decision was inadequate because it failed to address all the questions they raised in their request for a statement of decision.  We reject this contention.  The trial court did not address every single issue raised in the Fernandezes' request, but it issued a detailed order that explained its factual and legal basis for concluding that Escutia had obtained and maintained workers' compensation insurance during the relevant time period, which was the principal controverted issue for this cause of action.

First, the trial court answered some of the questions that the Fernandezes claim went unanswered.  For example, the Fernandezes asked what the legal standard was for determining whether Escutia obtained and maintained workers' compensation insurance for all their employees, and what the legal standard was for determining if Escutia substantially complied with his obligation to obtain and maintain workers' compensation insurance for all employees who performed labor at the Maher Road house.  The trial court discussed *Wright* and *Loranger*, and observed that under *Wright*, a contractor that thoroughly and intentionally underreported payroll to effectively have no workers' compensation insurance amounts to a failure to obtain workers' compensation insurance. (*Wright*, *supra*, 149 Cal.App.4th at p. 1121.)

The Fernandezes also asked if the trial court found that Escutia significantly underreported payroll and whether Escutia substantially complied with the requirement that he obtain and maintain workers' compensation insurance for employees whose payrolls were underreported.  As stated in the trial court's statement of decision, it did *not* find that Escutia significantly underreported payroll.  The trial court concluded that it was not convinced that Escutia "under-reported payroll such that he effectively had no workers' compensation policy as was found in *Wright v. Issak*, supra."  In other words,

29

the trial court did not find a significant amount of underreporting and, again, determined that Escutia complied with his obligation to obtain and maintain workers' compensation insurance.

Furthermore, a statement of decision is sufficient if it "addresse[s] the substance of all of the matters raised by [the parties'] request for specific findings. The trial court is not required to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case." (*Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118.) Some of the Fernandezes' questions did not need to be reached for the trial court to resolve the principal controverted issue at trial, and the trial court was not required to make immaterial factual and legal conclusions when rendering its statement of decision.

Accordingly, we find that the trial court's statement of decision was adequate, and the Fernandezes' claims to the contrary have no merit.

3. *Attorney Fees*

The Fernandezes argue that the trial court erroneously awarded attorney fees to Escutia as the prevailing party. Specifically, the Fernandezes argue that the award of attorney fees to Escutia for defending against their claim that he did not have complete workers' compensation insurance coverage was erroneous. They argue that an award of attorney fees is not permitted under section 7031, the trial court's award of attorney fees was irreconcilable with its determination that there was no written contract, Escutia's attorney waived attorney fees during an earlier deposition, and, in the event that the judgment is affirmed, the attorney fees award should be apportioned to exclude legal fees related to work on the Fernandezes' workers' compensation claim.

a. **Background**

In their second amended complaint, the Fernandezes alleged in their first cause of action that they entered into a written contract with Escutia for construction of the Maher

30

Road house. The Fernandezes further alleged that they would be entitled to recover attorney fees under the written contract under Civil Code section 1717.

Attached to the complaint was the unsigned contract prepared by Escutia in 2011 estimating that the Maher Road house would cost $985,950 to construct. The contract contained an attorney fees provision, which specified that "[i]f the parties become involved in litigation or arbitration arising out of [the] contract or the performance thereof, the court or arbitrator shall award reasonable costs, expenses and attorney's fees to the prevailing party. The trier of fact shall not be bound by any court fee schedule, and may, in the interest of justice, award the full amount of costs, expenses and attorney's fees incurred in good faith." After the court trial, the trial court determined that the evidence established that Escutia and the Fernandezes did not enter into a written agreement to build the Maher Road house.

Subsequently, the trial court entered a judgment in Escutia's favor, and Escutia moved for attorney fees under the written contract. In its postjudgment order, the trial court determined that Escutia was entitled to attorney fees for defending against the Fernandezes' contractual claims under the doctrine of mutuality of remedy under Civil Code section 1717 even though Escutia successfully argued that the parties did not enter into a written agreement. The trial court also determined that Escutia was entitled to attorney fees for the Fernandezes' workers' compensation claim under Code of Civil Procedure section 1021, which provides that parties can contractually agree that the prevailing party in a litigation will be entitled to attorney fees. The trial court further determined that apportionment of attorney fees was not required, except for the attorney fees and costs incurred in connection with Escutia's prosecution of his cross-complaint, because the attorney fee provision in the written contract was broad enough to include noncontractual claims like the Fernandezes' workers' compensation claim.

31

b. **General Principles**

Recovery of litigation costs is governed by Code of Civil Procedure section 1032, subdivision (b), which provides that "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." Under Code of Civil Procedure section 1033.5, subdivision (a)(10)(A)-(C), attorney fees are allowable as costs under Code of Civil Procedure section 1032 when authorized by contract, statute, or law.

Civil Code section 1717, subdivision (a) provides a legal basis for the recovery of attorney fees and provides in pertinent part that "[i]n any action on a contract, where the contract specifically provides that attorney[] fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney[] fees in addition to other costs." "Civil Code section 1717 . . . determines which party, if any, is entitled to attorneys' fees on a *contract claim only*." (*Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 708.)

"The primary purpose of [Civil Code] section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610 (*Santisas*).) Thus, "[i]t is now settled that a party is entitled to attorney fees under [Civil Code] section 1717 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney[] fees had it prevailed.' " (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870 (*Hsu*).) The rationale behind the reciprocal application of Civil Code section 1717 is that without it, "the right to attorney fees would be effectively unilateral . . . because only the party seeking to affirm and enforce the agreement could invoke its attorney fee provision." (*Santisas*, *supra*, at p. 611.)

32

Parties can also enter into contracts that determine their liability for attorney fees. Code of Civil Procedure section 1021 provides: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs, as hereinafter provided."

We review the trial court's determination of a legal basis for an award of attorney fees de novo. (*Linear Technology Corp. v. Tokyo Electron Ltd.* (2011) 200 Cal.App.4th 1527, 1535.)

c. **Attorney Fees For the Workers' Compensation Claim Is Not Permissible Under Civil Code Section 1717 or Code of Civil Procedure Section 1021**

The Fernandezes argue that the trial court erroneously awarded Escutia attorney fees for defending against their claim that he lacked adequate workers' compensation insurance coverage. They insist that their claim that Escutia failed to obtain and maintain workers' compensation insurance was brought under section 7031, subdivision (b), which does not contain a provision for the award of attorney fees. Moreover, they argue that attorney fees are not permissible under Code of Civil Procedure section 1021 because the trial court expressly found that there was no written contract between the parties. As we explain, we agree with the Fernandezes.

Here, the Fernandezes' first cause of action for breach of contract was based on the unsigned written agreement between the Fernandezes and Escutia for the construction of the Maher Road house. A copy of the agreement was attached to the Fernandezes' second amended complaint, and the Fernandezes cited to the contract and expressly requested attorney fees under the contract's attorney fees provision. The attorney fee provision states that if the parties become involved in litigation "arising out of [the] contract or the performance thereof, the court or arbitrator shall award reasonable costs, expenses and attorney's fees to the prevailing party. The trier of fact shall not be bound

33

by any court fee schedule, and may, in the interest of justice, award the full amount of costs, expenses and attorney's fees incurred in good faith."

Based on this attorney fee provision, the Fernandezes would have been entitled to attorney fees on their contractual causes of action had they prevailed. Under Civil Code section 1717, Escutia is entitled to attorney fees for defending against the contractual claims even though he successfully defended against the breach of contract claim by arguing that neither party agreed to the contract. (*Santisas*, *supra*, 17 Cal.4th at p. 611 [Civ. Code, § 1717 permits recovery of attorney fees on contract even when party litigant prevails by proving that contract is invalid, inapplicable, unenforceable, or nonexistent].)

The remaining question, however, is whether Escutia is entitled to attorney fees for successfully defending against the workers' compensation claim alleged in the Fernandezes' lawsuit.[11] We do not believe that he is.

First, we reject Escutia's argument that he is entitled to attorney fees under Civil Code section 1717 because the workers' compensation claim is an action "on a contract." The fact that the Fernandezes pleaded a breach of contract claim is not dispositive, neither is it dispositive that the dispute arose out of a contractual relationship. (See *Moallem v. Coldwell Banker Com. Group, Inc.* (1994) 25 Cal.App.4th 1827 (*Moallem*) [award of attorney fees not authorized under Civ. Code, § 1717 for causes of action for negligence and breach of fiduciary duty even though relationship between parties was contractual].)

In general, "[w]hether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded. If based on breach of promise it is contractual; if based on breach of a noncontractual duty it is

---

[11] The Fernandezes challenge only the award of attorney fees for Escutia's defense of the workers' compensation claim. They do not challenge the award of attorney fees for the other causes of action.

34

tortious." (*Arthur L. Sachs v. City of Oceanside* (1984) 151 Cal.App.3d 315, 322.) " 'It is difficult to draw definitively from case law any general rule regarding what actions and causes of action will be deemed to be "on a contract" for purposes of [Civil Code section] 1717.' [Citation.] Among the relevant factors are 'the pleaded theories of recovery, the theories asserted and the evidence produced at trial, if any, and also any additional evidence submitted on the motion in order to identify the legal basis of the prevailing party's recovery.' " (*Hyduke's Valley Motors v. Lobel Financial Corp.* (2010) 189 Cal.App.4th 430, 435.) For example, a cause of action seeking to establish the rights of the parties under a contract or seeking to enforce the parties' rights under a contract is an action on the contract. (*Id.* at p. 436; *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 242 (*Douglas*) [cause of action is on the contract if it seeks to define or interpret a contract's terms or enforce a party's rights or duties under the agreement].)

Escutia insists that the Fernandezes' workers' compensation cause of action was related to the enforcement of his obligations under the contract to properly carry out the construction. We disagree. The Fernandezes' cause of action that Escutia did not maintain complete workers' compensation insurance coverage does not seek to establish the rights of the parties, define the terms of the written agreement, or otherwise enforce the parties' rights under the written agreement. The cause of action sought recovery based on sections 7125.2 and 7031; there was no contractual obligation under the written agreement requiring that Escutia obtain and maintain workers' compensation insurance. Therefore, the cause of action is not "on a contract" and the mutuality of remedy doctrine under Civil Code section 1717 does not apply.

Second, Escutia is not entitled to attorney fees for defending against the workers' compensation insurance claim under Code of Civil Procedure section 1021, which provides that the parties may contractually agree to an award of attorney fees for tort and other statutory causes of action. In *Santisas*, the California Supreme Court held that "[i]f

35

a contractual attorney fee provision is phrased broadly enough . . . it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims:  '[P]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract.' "  (*Santisas*, *supra*, 17 Cal.4th at p. 608.)  And courts have concluded that attorney fee provisions found in contracts, may extend to noncontractual actions depending on whether the provision is broadly worded.  (*Xuereb v. Marcus & Millichap*, *Inc*. (1992) 3 Cal.App.4th 1338; *Lerner v. Ward* (1993) 13 Cal.App.4th 155.)  However, Code of Civil Procedure section 1021 cannot act as a basis for attorney fees when there is *no contract* providing for an award of fees, which is what the trial court determined when it concluded that the parties did not enter into a written agreement.

Moreover, as we have discussed, the mutuality of remedy doctrine under Civil Code section 1717, which permits the award of attorney fees to a prevailing party even if the party prevails on the theory that the contract was invalid or nonexistent, applies *only* to contractual claims.  Civil Code section 1717 does not extend to noncontractual claims where an entitlement to attorney fees is premised on an express agreement by the parties under Code of Civil Procedure section 1021.  (See *Moallem*, *supra*, 25 Cal.App.4th at p. 1832 ["Fairly or not, this restriction has for 25 years denied tort litigants the benefits of [Civil Code] section 1717."].)

Escutia argues that whether a party is entitled to attorney fees depends not on the evidence adduced at trial but on the pleadings, citing *Manier v. Anaheim Bus. Ctr. Co*. (1984) 161 Cal.App.3d 503 (*Manier*).  *Manier* stated that "[w]hether a party is entitled to attorney[] fees for the purpose of invoking Civil Code section 1717 depends not on the evidence adduced at trial or some interim proceeding, but on the pleadings."  (*Id*. at p. 508.)  Thus, Escutia insists that he is entitled to attorney fees because the Fernandezes repeatedly alleged in their second amended complaint that there was a written contract and that they were entitled to attorney fees under the contract.

*Manier* does not aid Escutia. The language in *Manier* that Escutia relies on is derived from the *Manier* court's conclusion that a prevailing party that is sued for breaching a contract that has an attorney fees provision may invoke Civil Code section 1717 and is entitled to mutuality of remedy, even if the contract was ineffective in making a binding agreement. (*Manier*, *supra*, 161 Cal.App.3d at p. 508.) The principle discussed in *Manier* is not novel; it is the same principle that we have already discussed and that has been reaffirmed in subsequent California Supreme Court cases like *Hsu*, *supra*, 9 Cal.4th at page 870. Nothing in *Manier* suggests that the doctrine of mutuality of remedy under Civil Code section 1717 extends to noncontractual claims.

As a result, we conclude that the trial court erred when it determined that Escutia was entitled to attorney fees for defending against the Fernandezes' cause of action alleging that he failed to have complete workers' compensation insurance coverage.

d. **Remand is Required to Determine Whether Apportionment of Fees is Necessary**

Next, the Fernandezes argue that the trial court should have apportioned the attorney fees between the contractual claims and the workers' compensation claim.

In *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, the California Supreme Court held that "[w]here a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under [Civil Code] section 1717 only as they relate to the contract action." (*Id.* at p. 129.) However, "[a]ttorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Id.* at pp. 129-130.) Attorney fees also need not be apportioned if the trial court reasonably finds that all claims in the case are inextricably intertwined. (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111 (*Abdallah*).) Finally, attorney fees do not need to be apportioned between causes of action when they share " 'a common core of facts or are based on related legal

37

theories' "; thus, if there are factual and legal issues in common between the contractual and noncontractual claims, Escutia would be entitled to recover attorney fees incurred in defense of those common issues. (*Douglas*, *supra*, 211 Cal.App.4th at p. 250.)

Apportionment of attorney fees is a decision that is vested with the trial court, and we must typically defer to the trial court's factual findings on apportionment. (*Abdallah*, *supra*, 43 Cal.App.4th at p. 1111 [apportionment of fee award is within trial court's discretion]; *Carpenter & Zuckerman*, *LLP v*. *Cohen* (2011) 195 Cal.App.4th 373, 378 [order granting or denying award of attorney fees reviewed for abuse of discretion and reviewing court reviews the trial court's factual findings for substantial evidence].)

Below, the trial court declined to apportion the attorney fees because it believed that the language of the attorney fees provision found in the written agreement was broad enough to encompass *all* of the Fernandezes' causes of action. As we have concluded, the trial court erroneously relied on the attorney fees provision and Code of Civil Procedure section 1021 when determining Escutia's entitlement to fees. Thus, the trial court incorrectly applied the law when it awarded attorney fees, and it did not make any factual findings about whether the Fernandezes' contractual claims overlapped with their workers' compensation claim.

Since the trial court did not make any factual findings on these issues in the first instance, and since the trial court is in a superior position to examine these issues and determine the value of the legal services that were rendered before it, we believe the proper remedy is to remand the matter to the trial court for it to determine whether the contractual claims and the workers' compensation claim are overlapping or inextricably intertwined, and, if apportionment of attorney fees is necessary, to redetermine the amount of fees that should be awarded to Escutia. (*Douglas*, *supra*, 211 Cal.App.4th at p. 250 [the " 'trial court, having heard the entire case, [is] in the best position to determine whether any . . . allocation of attorney fees [is] required' "].)

38

e. **Escutia's Attorney Did Not Waive Attorney Fees**

The Fernandezes also argue that Escutia's attorney expressly waived any entitlement to attorney fees based on statements that he made during an earlier deposition. The trial court concluded that there was no waiver because it was clear that Escutia's attorney was discussing attorney fees related to Escutia's cross-complaint. We agree with the trial court's conclusion.

During Escutia's deposition, the Fernandezes' trial counsel asked Escutia, "This is a cross-complaint that your attorney filed. This is where you're asking to get money from my clients." Escutia answered, "Okay." The Fernandezes' attorney then asked Escutia's attorney, "[Y]ou're requesting attorney[] fees according to proof. Does [Escutia] know the basis for that?" Escutia's attorney responded, "I—At this stage I don't have any contracts or other basis that will award attorney[] fees to either party." The Fernandezes' attorney responded, "I will accept that for now. If that changes, please advise." Escutia's attorney replied, "I will."

The conversation between the Fernandezes' attorney and Escutia's attorney solely concerned the cross-complaint. In his cross-complaint, Escutia alleged a cause of action of breach of *oral* contract. It is unclear whether any alleged oral agreement between Escutia and the Fernandezes made a reference to attorney fees. Escutia's attorney, however, did not say during the deposition there was no basis for the attorney fees requested in Escutia's answer to the Fernandezes' second amended complaint. As we have discussed, the Fernandezes alleged a breach of contract in their second amended complaint based on the unsigned agreement to build the Maher Road house, which contained a provision for attorney fees.

Thus, we reject the Fernandezes' claim that Escutia's attorney waived an entitlement to attorney fees based on his comments during the deposition. We agree with the trial court's assessment that Escutia's attorney's statements were directed toward Escutia's cross-complaint, not his answer.

**DISPOSITION**

In case No. H046529, the judgment is affirmed.

In case No. H047015, the postjudgment order granting attorney fees is reversed and the matter is remanded for the trial court to determine whether the attorney fees should be apportioned and, if necessary, to redetermine the amount of attorney fees to which Escutia is entitled.

The parties shall bear their own costs on appeal.

_____
Greenwood, P.J.

WE CONCUR:


_____
 Elia, J.




_____
 Bamattre-Manoukian, J.




Fernandez et al. v. Escutia
Nos. H046529 H047015